**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MICHAEL BAUM and
TERI BAUM MARKOWITZ,
*as Administrators of the Estate of Etta*
*Charlotte Baum, a/k/a Sherry Baum,*

                              Plaintiffs,

        - v -                                          Civ. No. 1:10-CV-424
                                                            (RFT)[1]

NORTHERN DUTCHESS HOSPITAL and
WINGATE OF ULSTER, INC., d/b/a
*Wingate at Ulster*,

                              Defendants.

**APPEARANCES:**                        **OF COUNSEL:**

ZWEIBEL AND FAIRBANKS, L.L.P.           Alan S. Zweibel, Esq.
*Attorney for the Plaintiffs*
72 Maiden Lane, P.O. Box 3907
Kingston, New York 12402-3907

CARTER CONBOY LAW FIRM                  William J. Decaire, Esq.
*Attorney for Wingate of Ulster, Inc*.
20 Corporate Woods Boulevard
Albany, New York 12211

PHELAN, PHELAN LAW FIRM                 Timothy S. Brennan, Esq.
*Attorney for Northern Dutchess Hospital*
302 Washington Avenue Extension
Albany, New York 12230

---

[1] On October 6, 2010, the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73, and with the consent of all parties, referred this matter to this Court to preside over all proceedings, including trial.  Dkt. No. 17, Not. of Consent & Order of Referral.

   For purposes of this Motion, the Court will refer to the collective Plaintiffs as Baum.

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## <u>MEMORANDUM-DECISION and ORDER</u>

Currently before this Court is Defendant Wingate of Ulster, Inc.'s (hereinafter "Wingate") Motion to Dismiss/Summary Judgment, pursuant to FED. R. CIV. P. 12(c) and 56, seeking to dismiss Baum's Fifth Cause of Action, which sounds in 42 U.S.C. § 1983. Dkt. No. 14, Not. of Mot., dated Oct. 1, 2010.[2] Baum opposes the Motion, dkt. nos. 19 & 20,[3] which Wingate replies thereto, dkt. no. 22.[4] For the reasons stated below, Wingate's Motion to Dismiss/Summary Judgment is **granted**.

### I.  COMPLAINT

This action was commenced in New York State Supreme Court, County of Ulster on March 23, 2010. Dkt. No. 1. On April 9, 2010, Wingate removed this lawsuit from Ulster County Supreme Court to the Northern District of New York, pursuant to 28 U.S.C. §§ 1441 and 1446, insomuch as Baum's Fifth Cause of Action

---

[2] Wingate's Motion to Dismiss/Summary Judgment is comprised of the following: Dkt. No. 14, Not. of Mot.; Dkt. No. 14-1, William J. Decaire, Esq., Aff., dated Oct. 1, 2010; Dkt. No. 14-2, Compl.; Dkt. No. 14-3, Def. Wingate's Ans.; Dkt. No. 14-4, Rule 7.1 Disclosure Statement; Dkt. No. 14-5, Statement of Material Facts; and, Dkt. No. 14-6, Mem. of Law.

[3] Dkt. Nos. 19 and 20 are the same document, Alan S. Zwiebel, Esq., Aff., dated Nov. 15, 2010. Baum's Response to the Statement of Material Facts is also denoted as Dkt. No. 20, while Dkt. No. 20-1 is Baum's Memorandum of Law.

[4] Wingate's Reply to Baum's Opposition is a Reply Memorandum of Law. Dkt. No. 22.

claims a violation of Sherry Baum's civil rights, pursuant to 42 U.S.C. § 1983, thus

providing a basis for federal question jurisdiction. *Id.* The Court, as required by law,

shall accept all allegations in the Complaint as true for the purpose of this Motion. *See*

*infra* Part II.A.

On or about October 22, 2007, through and inclusive of November 2, 2007,

Decedent Sherry Baum (hereinafter "Decedent") was admitted to Northern Dutchess

Hospital (hereinafter referred to as "Northern Dutchess") for hip surgery and other

medical complaints. Thereafter, on November 2 to December 5, 2007, the Decedent

was admitted to Wingate for a right hip fracture and rehabilitation. During Decedent's

convalescence at Wingate, she developed bedsores and other injuries. Baum alleges

that Wingate's negligence and gross negligence, along with Northern Dutchess's gross

negligence, contributed to the Decedent's injuries and eventual death. *See generally*

Dkt. No. 1, Compl. (Causes of Action 1-4). The Fifth Cause of Action, which is the

subject of this Motion to Dismiss, is asserted solely against Wingate.[5]

Wingate is a residential nursing home facility as defined in 42 U.S.C. § 1396r

and New York Public Health Law § 2801(3) and is subject to federal rules and

---

[5] Because the Fifth Cause of Action is asserted solely against Wingate, dkt. no. 1, Compl. at ¶¶ 57-58, Northern Dutchess does not oppose this Motion. Dkt. No. 18, Timothy S. Brennan, Esq., Aff., dated Nov. 15, 2010. If, however, this Court were to find that the Fifth Cause of Action is relevant as to it as well, Northern Dutchess joins Wingate's Motion to Dismiss. *Id.*

regulations.[6]  Pursuant to both federal and state laws, Wingate is supposed to provide its patients with "medically related social services to attain the highest practicable physical, mental and psychosocial well-being."  Compl. at ¶¶ 58-60.  The Complaint continues that because § 1396r confers certain rights upon residents of nursing homes, including the Decedent, Wingate's failure to provide such medically related social services, particularly with regard to treating her bedsores, violated her civil rights under 42 U.S.C. § 1983.

## II.  STANDARD OF REVIEW

Wingate's Motion to Dismiss is pursuant to both Rule 12(c), a motion on the pleadings, and 56, summary judgment.  Dkt. No. 14.  With respect to the Rule 56 aspect of the Motion to Dismiss, Wingate submits a Statement of Material Facts stating that Wingate is a privately held domestic corporation, there are no allegations within the Complaint that hold it as a state actor, and there are no allegations that it was acting under the color of state law for purposes of 42 U.S.C. § 1983.  Dkt. No. 14-4.  Baum controverts Wingate's Statement.  Dkt. No. 20.

### A.  Motion to Dismiss pursuant to FED. R. CIV. P. 12(c)

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of

---

[6] The applicable rules and regulation can be found in 42 C.F.R. Part 483.

the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).  In applying Rule 12(c), a court must utilize the same standard as that applicable to a motion under Rule 12(b)(6).  *The Irish Lesbian and Gay Org. v. Giuliani*, 143 F.3d 638, 644 (2d Cir. 1998).  On a motion to dismiss pursuant to Rule 12(b)(6), the court accepts as true all factual allegations in the complaint.  *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (citation omitted).

On a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, _U.S._, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)); *Cruz v. Beto*, 405 U.S. 319, 322 (1972).  Accepting the facts as true is not applicable to legal conclusions: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S.Ct. at 1949.  Stated another way, "a pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action' are not entitled to the "assumption of truth." *Id.* at 1949 & 1951 (quoting, in part, *Bell Atl. Corp. v. Twombly,* 550 U.S. at 555).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to

which the court may take judicial notice." *Spence v. Senkowski*, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)).  Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint*' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis added)).  On a motion to dismiss, the trial court's function "is merely to assess the legal plausibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" factual allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6 (1963); *see also Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008).  A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint has plausibility, that is, when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Ashcroft v. Iqbal*, 129 S.Ct. at 1949 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556). The plausibility standard requires more than "sheer possibility that a defendant has acted unlawfully." *Id*. In essence, the complaint must "[be] nudged . . . across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 570 (quoted in *Ashcroft v. Iqbal*, 129 S.Ct. at 1951).[7] This is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (cited in *Ashcroft v. Iqbal*, 129 S.Ct. at 1950). In spite of the deference the court is bound to give to the plaintiff's factual allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 526 (1983).

## B.  Summary Judgment Standard

Further, under Rule 12(c), a court may consider, "in its discretion and upon notice to all parties, materials outside the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d at 642 (citation omitted). However, since the Notice of Motion filed in this case explicitly informed Baum that Wingate was moving for summary

---

[7] The Supreme Court made explicitly clear that this standard is applicable to "all civil actions." *Ashcroft v. Iqbal*, _U.S._, 129 S.Ct. 1937, 1953 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).

judgment, the Court does not have to provide further notice. *McGann v. United States Dep't of Justice*, 100 F.3d 943 (2d Cir. 1996). To the extent that a defendant's motion for summary judgment under FED. R. CIV. P. 56 is based entirely on a plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted). Yet, in order to determine a legal question, "summary judgment procedure[s] may be properly invoked." *Id*. (citation omitted). It is also within a court's discretion to convert a motion filed under Rule 12(b) and (c) into a motion seeking summary judgment when matters outside the pleadings have been presented and accepted by the court. *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566 (2d Cir. 2005); *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d at 273 (finding that summary judgment may be sought at any time after the pleadings have been served). Here, Wingate has served its Answer, the parties have filed Statements of Material Facts, albeit brief, and Affidavits have been presented.

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate

through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the movant.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994)  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such

statements is better left to a trier of fact.  *Scott v. Coughlin*, 344 F.3d at 289 (citing *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) and *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## III. DISCUSSION

### A. Parties' Basic Contentions

The crux of Wingate's Motion to Dismiss/Summary Judgment is that it is a privately held domestic corporation formed in New York, with no parent corporation or public ownership.  Dkt. No. 14-1, Decaire Aff. at ¶ 6.  In the context of a civil rights action pursuant to 42 U.S.C. § 1983, Baum would be required to establish that

Case 1:10-cv-00424-RFT   Document 24   Filed 01/24/11   Page 11 of 46

Wingate, a private entity, was acting under color of state law, in order to state a plausible federal civil rights cause of action. Wingate, as a private nursing home, contends that Baum is unable to state a claim under any theory, no matter how it is analyzed or constructed, that it was acting under the color of state law or a state actor. *See generally* Dkt. No. 14-6, Def.'s Mem. of Law.

Baum states that Wingate is in fact a state actor under 42 U.S.C. § 1983 with respect to the federally imposed provisions requiring that residents of nursing homes receive quality medical and nursing care. 42 U.S.C. § 1396r (also known as the Federal Nursing Home Reform Act (hereinafter "FNHRA")). In making this assertion, Baum claims that (1) FNHRA creates federal rights for residents of nursing homes that are actionable under 42 U.S.C. § 1983, and (2) because Wingate and New York State are so inextricably intertwined and have a close and nearly inseparable nexus in providing quality medical services, Wingate acted under the color of state law when treating the Decedent. Because FNHRA imposes upon the State an "obligatory, active and ongoing participa[tion] in the definition, operation, control and supervision of the provisions of nursing home services," and because the State has "insinuated itself into the business of providing quality nursing care services," all of which would make the two entities joint actors, Wingate's actions or inaction are fairly attributable to the State. *See generally* Dkt. No. 20-1, Pls.' Mem. of Law.

*-11-*

## B.  Federal Nursing Home Reform Act

The Medicaid Act, established pursuant to Title XIX of the Social Security Act, and codified at 42 U.S.C. § 1396, *et seq*., "is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Virgina Hosp. Ass'n*, 496 U.S. 498, 502 (1990).  A state's participation as an administrator of the program is voluntary but if its does enter into such a program, it must comply with certain requirements imposed by the Medicaid Act and its corresponding regulations. *See* 42 C.F.R. § 430.  To qualify for federal assistance, states are required to submit a comprehensive plan to the Secretary of Health and Human Services (hereinafter "Secretary"), and, by doing so, the plan should provide "a scheme for reimbursing health care providers for the medical services provided to needy individuals." *Wilder v. Virgina Hosp. Ass'n*, 496 U.S. at 502  (citing 42 U.S.C. § 1396(a)).  And, in order for health care providers, such as nursing homes, to qualify to receive the reimbursement, they must be certified by complying with the rules and regulations of the statute.  *See generally* 42 U.S.C. § 1396r(b)-(d).

In 1987, Congress passed the FNHRA, which was contained in the Omnibus Budget Reconciliation Act of 1987 (OMBRA), codified at 42 U.S.C. §§ 1395i-3 and

1396r.[8]  This Act requires nursing homes to satisfy certain standards regarding the quality of care of the residents in order to be certified to receive reimbursement.  The Act further requires the Secretary and the participating State to oversee and inspect participating nursing homes, conduct surveys, and to impose sanctions, such as withholding reimbursement, for noncompliance or failure to meet the required standard of care.  *See* 42 U.S.C. § 1396r(h).

42 U.S.C. § 1396r(b) sets standards relating to providing health related services in a participating nursing home.  For example, a nursing home facility must:

- care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident. *Id*. at (b)(1)(A);
- provide services and activities to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.  *Id*. at (b)(2); and
- provide medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident.  *Id*. at (b)(4).

Moreover, under 42 U.S.C. § 1396r(c), nursing facilities must protect and promote the rights of the residents, such as (1) free choice of attending physician, (2) freedom from physical and mental abuse, (3) certain privacy, (4) certain confidentiality, (5) reasonable accommodations, (6) ability to voice grievances, (7) participation in

---

[8]  Pub. L. No. 100-203, §§ 4201-4218, 1987 U.S.C.C.A.N. (101 Stat.) 1330, 1330-160 to 1330-221.

resident groups and social, religious, and communities activities, and (8) any other right established by the Secretary.  A laundry list of those other rights may be found in 42 C.F.R. §§ 483.10 through 483.25.  Since pressure sores are an allegation in this action, the Court directs attention to § 483.25, which requires a facility to ensure that "[a] resident who enters the facility without pressure sores does not develop pressure sores . . . and [a] resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing."[9]

### C.  42 U.S.C. § 1983

It is well-settled law that in order for a plaintiff to state a claim under § 1983, she must allege that there was a violation of her rights secured by the Constitution and laws of the United States and that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *Trakansook v. Astoria Fed. Sav. and Loan Ass'n*, 2008 WL 4962990, at *1 (2d Cir. Nov. 21, 2008) (quoting *West v. Atkins*).  As a matter of substantive constitutional law, "most rights secured by the Constitution are protected only against infringement by governments."  *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936

---

[9] New York has promulgated its own public policy regarding the rights and responsibilities of patients who are receiving care in nursing home.  N.Y. PUB. HEALTH LAW § 2803-c.  New York's statement of rights expounds upon those rights pronounced in the FNHRA.  *Id.* at § 2803-c(3).

(1982) (quoting *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156 (1978)).  As another general principle of constitutional law, private conduct is generally beyond the reach of § 1983.  *Brentwood Acad. v. Tennesee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001).[10]

State action is an essential element of any § 1983 claim.  *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. at 934 (explaining that the "under color of any statute" language is to enforce the provisions of the Fourteenth Amendment and that if a defendant's conduct satisfies the state-action requirement then that conduct is also action under color of state law under § 1983); *Rounseville v. Zahl*, 13 F.3d 625, 627-28 (2d Cir. 1994) (noting the state action requirement for § 1983).  Traditionally then, "the definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996) (quoting *West v. Atkins*, 487 U.S. at 49).

---

[10] As the Second Circuit explained in *Cooper v. United States Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009),

> [t]he Due Process Clause of the Fourteenth Amendment provides: [N]or shall any State deprive any person of life, liberty, or property, without due process of Law. U.S. Const. amend. XIV, § 1.  By its terms, private action is immune from the restrictions of the Fourteenth Amendment,' and the Amendment offers no shield against private conduct, however discriminatory or wrongful. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 349 (1974) (quotation marks omitted).

Stated differently, a defendant acts under color of state law for § 1983 purposes "when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. at 50 (citations omitted). Generally speaking then, when a public employee acts in his official capacity, he is acting under the color of state law. *Id.* at 50. But neither public position nor title is determinative of that conclusion; rather the critical factor is the public employee's functionality within government. *Id.* at 50-53 (discussing the functionality distinction rendered in *Polk County v. Dodson*, 454 U.S. 312, 451 (1981)).

A private corporate entity may be deemed a state actor "only if (1) the government created the corporate entity by special law, (2) the government created the entity to further governmental objectives, and (3) the government retains permanent authority to appoint a majority of the directors of the corporation[.]" *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 153 (2d Cir. 2004) (quoting *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 84 (2d. Cir. 2000)). Or, another test to determine state actor or state action is whether a private entity's actions are fairly attributable to a State in such a way that there is a close nexus between the State and the challenged action of the entity, as though the "action of the latter may be fairly treated as that of the State itself." *United States v. Stein*, 541 F.3d 130, 146 (2d Cir. 2008) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). There is no

single test to identify state action and state actors.  But, before the Court engages in that discussion, it must first determine if there is a constitutional right or federal right alleged in the Complaint that would support a § 1983 action.  *See infra* Part III.E (for further discussion on state action).

### D.  Implied Federal Right of Action and 42 U.S.C. § 1983

The Court's first inquiries are (1) whether FNHRA, 42 U.S.C. § 1396r, provides an explicit and independent federal private cause of action for nursing home residents, and, if so, (2) whether such a private federal cause of action can be brought against a private, non-governmental nursing home.  The Supreme Court has repeatedly stated that § 1983 is the vehicle to "safeguard[] certain rights conferred by federal statues[,]" as well as the Constitution.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1989)).  "[H]owever, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*."  *Id*. (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106 (1989) (emphasis in original)); *Torraco v. Port Auth. of New York and New Jersey*, 615 F.3d 129, 136 (2d Cir. 2010).  All of the courts that have addressed this very issue have concluded that there is no explicit federal private cause of action promulgated in FNHRA.  *See e.g.*, *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 525 n.2 (3d Cir. 2009).  Invariably, this has required those courts to next determine whether § 1396r has

"right-creating" language that translates into an implied federal action, enforceable under § 1983.  These courts, particularly the circuit courts, have arrived at divergent determinations as to whether a federal action exists.

For more than two decades, the Supreme Court has confronted whether certain federal statutes create a personal right that is enforceable under § 1983.  The Supreme Court's discourse on this challenging subject is clarified in *Gonzaga Univ. v. Joe Doe*, 536 U.S. 273 (2002).  *See Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 149 (2d Cir. 2006) (noting that *Gonzaga* clarified some of the confusion created by aspects of *Blessing v. Freestone*, 520 U.S. 329).  Therefore, this Court derives its principle instructions from *Gonzaga* as to whether FNHRA creates a personal right that can be enforced under § 1983.

Summarizing the history of the Supreme Court's discourse on this issue, *Gonzaga* made certain that "legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."  *Gonzaga Univ.*, 536 U.S. at 280 (citations omitted).  "[U]nless Congress speak[s] with a clear voice and manifests an unambiguous intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983 action."  *Id*. (citations and quotation marks

omitted).[11]  Reinforcing that point, the Supreme Court emphatically "reject[ed] the notion that . . . anything short of an unambiguously conferred right . . . support[s] a cause of action brought under § 1983 . . . .  [I]t is *rights*, not the broader or vaguer benefits or interests that may be enforced[.]"  *Id.* at 283 (internal quotation marks omitted; emphasis in original).[12]

In order for a statute to create a private right of action, its text must be phrased in terms of an "unmistakable focus" on a benefit class.  *Id.* at 284 (citations and quotation marks omitted).  If "the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit . . . under § 1983[.]"  *Id.* at 286.  A statute does not create a new enforceable right if (1) it does not contain any clear and unambiguous right-creating language, "no less no more," (2) has an aggregate, not individual focus, and (3) focuses primarily on the government's allocation of resources.  *Id.* at 290.  A mere intimation or reference to rights, "even as a shorthand means of describing standards and procedures imposed

---

[11] The *Gonzaga* Court reiterates that "[o]ur most recent decisions . . . have rejected attempts to infer enforceable rights from Spending Clause statutes."  536 U.S. 273, 281 (2002).  The Supreme Court continues by pronouncing that "we have never before held, and decline to do so here, that spending legislation drafted in terms of resembling those of [Family Educational Rights and Privacy Act] can confer enforceable rights."  *Id.* at 279.

[12] For all intents and purposes, there is no discernable difference between personal rights that may exist in context of § 1983 and the implied right of action context.  *Gonzaga*, 536 U.S. at 285.  Once it has been demonstrated that a statute confers an individual right, the right is presumptively enforceable by § 1983.  *Id.* at 284.

. . . should [not] give rise to a statute's enforceability under § 1983." *Id.* at p. 289 n.7 (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981) for the proposition that there is no presumption of enforceability merely because a statute "speaks in terms of rights").

Even with these pellucid instructions from the Supreme Court, courts have profoundly disagreed over whether the Medicaid Act provisions, overall, or 42 U.S.C § 1396r, in particular, provide an individual enforceable federal rights, especially against private nursing homes. In fact, there is a split among the circuits and, in some respect, there appears to be a reverberation of inconsistency, even intra-circuit.

In support of the proposition that 42 U.S.C. § 1396r does indeed provide a private cause of action for nursing home residents that is enforceable under § 1983, Baum relies predominately upon *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520 (3d Cir. 2009), primarily for two essential reasons: (1) the facts in *Grammer* are uncannily similar to our facts; and (2) it is the only circuit case that has found a nursing home liable under FNHRA, 42 U.S.C. § 1396r *et seq.*, for the type of treatment, or lack thereof, afforded a decedent. As in our case, Grammer alleged under § 1983 that the Kane Center, a county-operated nursing home, failed to provide the standard of care delineated by the FNHRA, thus depriving her mother of her civil rights. Grammer further alleged that as a result of the Kane Center's failure to provide

proper care, Grammer's mother developed decubitus ulcers (pressure sores), became

malnourished and eventually died.  Entreating to 42 U.S.C. § 1396r(b) and (c)'s right

to be free, *inter alia,* from physical or mental abuse, the Third Circuit held that

FNHRA is "sufficiently rights-creating and that the rights conferred by its various

provisions are neither 'vague and amorphous' nor impose upon states a mere

precatory obligation." *Id*. at 522 (citing *Gonzaga*, 536 U.S. at 287).  In conducting its

analysis, the Third Circuit referred to the three-factor test announced by the Supreme

Court in *Blessing,* as well as *Gonzaga*'s requirement that Congress must have

unambiguously conferred an enforceable right:

> [F]irst, courts should determine whether Congress intended that the
> statutory provision in question benefits the plaintiff; second, courts
> should decide whether the right asserted is so "vague and amorphous"
> that its enforcement would strain judicial competence; and lastly, courts
> should determine whether the statute unambiguously imposes a binding
> obligation on the states. [*Blessing v. Freestone*], 520 U.S. at 340-44.
> The  Supreme Court further instructed that if a plaintiff successfully
> meets these three requirements, she has established a rebuttable
> presumption that she has such a right.  However, this presumption could
> be rebutted if Congress "specifically foreclosed a remedy under § 1983."
> *Gonzaga Univ.,* 536 U.S. at 285.

*Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d at 525-26.

The *Grammer* court found that 42 U.S.C. § 1396r met the *Blessing* factors.

First, the Third Circuit found that Grammer's deceased mother was an obvious

intended beneficiary of § 1396r: "FNHRA's concern is whether each individual placed

in a nursing home receives proper care."  *Id*. at 527-28 (citing, *inter alia*, *Concourse*

*Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136 (2d Cir. 2001) for the proposition

that Medicaid recipients were the intended beneficiaries of § 1396r).[13]  Second, the

Third Circuit found that rights asserted by Grammer were not vague or amorphous,

referring to repeated use of the word "must," in the statute such as "must provide a

basic level of service and care for resident and Medicaid patients." *Id.* at 528.  And,

finally, the Third Circuit found that the language unambiguously binds the state and

the nursing home. *Id.*  In sum, the Third Circuit found a laundry list of rights afforded

to nursing home residents and commands to the State and nursing homes, and that "the

specific rights conferred by FNHRA could not be clearer . . . [and] that Congress did

use rights-creating language sufficient to unambiguously confer individually

enforceable rights." *Id.* at 531.  Moreover, the Circuit found no evidence of

congressional intent to preclude enforcement of these rights because "no provision

contains express terms to that effect and no comprehensive remedial scheme is

---

[13] It is critical to note that when the Second Circuit held that Medicaid recipients were the intended beneficiaries of § 1396r, it was drawing a distinction between the recipients and the nursing homes that brought a § 1983 action, the latter of which was deemed not to be an intended beneficiary of the statute. *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen*, 249 F.3d 136 (2d Cir. 2001); *see also Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 299 (E.D.N.Y. 2008) (finding that medicaid recipients were the intended beneficiaries of § 1396r); *In re HYAHSA Litig.*, 318 F. Supp. 2d 30, 40 (N.D.N.Y. 2004) (citing to *Concourse*'s finding that § 1396r is obviously intended to benefit medicaid beneficiary and not medical providers).  Other than that reference to Medicaid recipients being an intended beneficiary of the statute, *Concourse* provides little else in terms of either the *Grammer* analysis or our discussion here.  Conspicuously absent from *Concourse* is a finding that § 1396r unambiguously grants a personal federal cause of action to nursing home residents against either the state or a state actor and thus has dubious prudential value for us.

established by the provisions at issue." *Id*. at 532 (citations omitted).[14]

Evidently, other courts have not adopted the Third Circuit's line of reasoning in holding a nursing home subject to a § 1983 lawsuit, including a vigorous dissent by Judge Stafford. *Id*. at 532-34.[15]  A strikingly contrary view on whether FNHRA conceivably creates a private cause of action comes from the Second Circuit. *See Prince v. Dicker*, 29 Fed. Appx. 52 (2d Cir. 2002).  In *Prince*, a brother of a former nursing home resident filed a lawsuit against the owner of the Shore View Nursing Home, alleging that it violated the Medicaid anti-fraud provisions, 42 U.S.C. § 1320a-7b(d) and the FNHRA, 42 U.S.C. § 1396r.  In a laconic ruling, the Second Circuit, relying upon the reasoning in *Brogdon ex rel Cline v. Nat'l Healthcare Corp*., 103 F. Supp. 2d 1322, 1330-32 (N.D. Ga. 2000), pronounced that FNHRA's provisions "do not confer a right of action on [the plaintiff] that can be enforced against a private

---

[14] The Third Circuit acknowledged that the Medicaid Act speaks in terms of an agreement between Congress and the State and notes the power of the Secretary to suspend payment to a State if it fails to comply with the Act's requirements.  Because other courts have recognized this agreement and enforcement tool as the primary focus of the Medicaid Act, it gave the Circuit pause when deciding prior cases and some reticence at the moment of the *Grammer* decision. *Grammer,* 570 F.3d at 531.  Yet, the Circuit found that these enforcement provisions did not neutralize the right-creating language they found replete within the Act. *Id*.

[15] This Court recognizes that other circuits have found right-creating features in other provisions of the Medicaid Act, but none directly on point with our case. *See Rolland v. Romney*, 318 F.3d 42 (1st Cir. 2003); *Doe v. Kidd*, 501 F.3d 348 (4th Cir. 2007); *Dickson v. Hood*, 391 F.3d 581 (5th Cir. 2004); *Watson v. Weeks*, 436 F.3d 1152 (9th Cir. 2006).  But it should also be noted that these lawsuits were brought against either a state agency or a public official and none were for the recoupment of compensatory damages.  This is a pivotal point, which distinction should not be lost upon the parties when the Court expostulates who and what type of entities may constitute a state actor under § 1983. *See infra* Part III.E.

nursing home such as Shore View." *Id*. at 53.  Because of *Prince v. Booker's* truncated treatment of the issue, the Court is compelled to review the analysis of *Brogdon v. Nat'l Heathcare Corp.*, to understand and appreciate the legal basis upon which *Prince* was decided.

The facts and issues in *Brogdon* are, in material respects, similar to *Grammer* and this case.  Yet, *Brogdon* arrives at a contrary conclusion from that of *Grammer*.  The plaintiffs in *Brogdon* brought an action against National Healthcare, a privately owned Delaware corporation, alleging violations of the federal standards promulgated in 42 U.S.C. § 1395i-3 (Medicare) and 42 U.S.C. § 1396r (Medicaid) as well other state regulations and common law causes of action.  103 F. Supp. 2d at 1326-27.  The question therein was whether Congress intended to furnish nursing home residents with the right to file a federal statutory lawsuit against a nursing home not only to enforce the standards required for participation in Medicaid programs, but also to recover damages.  This Court's attention is specifically drawn to the Georgia district court's analysis of implied causes of action.  *Id*. at 1330-33.  Recognizing that 42 U.S.C. § 1396r does not expressly authorize private causes of action to enforce its provisions, the Georgia district court's analysis concentrated on whether there is an implied cause of action.  The *Brogdon* court found that the Medicaid Act was enacted to benefit recipients and bestowed upon them certain federal rights.  But, the court

also found that "[e]ven if plaintiffs enjoy certain federal rights, however, they may not necessarily possess a private cause of action to enforce those rights," and concluded "that Congress did not intend to create such a remedy[,]" that is, a private cause of action against nursing homes. *Id*. at 1330-31 (citing numerous cases).[16]

Continuing with its examination, *Brogdon* noted that the "central purpose of [FNHRA] is to improve the quality of care for Medicaid-eligible nursing homes, and either to bring substandard facilities into compliance with Medicaid quality of care requirements or to exclude them from the program." *Id*. at 1331 (citing H.R. Rep. No. 100-391, at 452 (1987), reprinted at 1987 U.S.C.C.A.N. §§ 2313-1, 2313-272). Further, the court made the critical observation that Congress did not foreclose a nursing home resident from pursing common law remedies and, in fact, explicitly recognized that such a right exists. *Id*. (citing, *inter alia*, 42 U.S.C. 1396r(h)(8)).[17]

---

[16] The *Brogdon* Court cited a host of cases for the proposition that the Medicaid Act did not provide a private cause of action against medical providers. *See, e.g.*, *Wheat v. Mass*, 994 F.2d 273, 276 (5th Cir. 1993) (finding that a hospital is not a state actor solely because it receives medicaid funds and is subject to state regulation); *Stewart v. Bernstein*, 769 F.2d 1088, 1092-93 (5th Cir. 1985) (finding that Congress did not grant nursing home residents an implied cause of action to enforce Medicaid's standards but did "contain numerous provisions short of judicial enforcement that are designed to redress recipients' grievances"); *Estate of Ayres v. Beaver*, 48 F. Supp. 2d 1335, 1339-40 (M.D. Fla. 1999) (finding that Congress did not provide a private federal right under the Medicaid Act); *Nichols v. St. Luke Ctr.*, 800 F. Supp. 1564, 1568 (N.D. Ohio 1992). Our research reveals that none of these cases have been overturned by a higher court.

[17] In viewing the entire structure of 42 U.S.C. § 1396r, we learn that there is an enforcement provision found in subsection h. Generally, this subsection grants the State and the Secretary authority to take immediate action and impose sanctions, including withholding funds, if a nursing home no longer meets the requirements of subsection (b), (c), or (d). 42 U.S.C. § 1396r(h)(1) &

(continued...)

Identifying that common law actions are not precluded by FNHRA is an indication that nursing home residents are not without any remedy - a point which would obviate the need to create another enforceable right.  Plainly put, "these citations [42 U.S.C. § 1396r and House Report] simply emphasize that Congress did not consider authorization of a private cause of action by federal statute." *Id*.

Other courts agree with *Brogdan*'s findings and rulings that FNHRA did not create a federal private cause of action and challenge the reasoning in *Grammer*. Recently, the Eastern District of Kentucky took direct aim at *Grammer* and declined to adopt its holding.  *Duncan v. Johnson-Mathers Health Care, Inc.*, 2010 WL 3000718 (E.D. Ky. July 28, 2010).  For the *Duncan* court, FNHRA does not manifest an "unmistakable focus on the rights of individual nursing home residents" but rather the focus is on the requirements that nursing home are expected to meet in order to remain eligible for funding.  *Id*. at *8 (citing *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001), which further stated that "the focus . . . on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a

---

[17](...continued)
(3).  Additionally, subsection (h) states, in part, that "[t]he remedies provided under this subsection are in addition to those otherwise available under State or Federal law and shall not be construed as limiting such other remedies, including any remedy available to an individual at common law." *Id*. at § 1396r(h)(8).

particular class or person").[18]  *Duncan* also took particular exception to *Grammer*'s finding that Congress explicitly included the word "rights" when identifying expectations and entitlements.   Finding that *Grammer*'s ruling appears to be inconsistent with *Gonzaga*, *Duncan* articulated a conversely different ruling by noting that while FNHRA discusses rights of nursing home residents and has the intent of improving the quality of care received by them, yet the ultimate focus is on the nursing home - not the nursing home resident.  *Id*. at *8.  On another point, *Duncan* took exception to *Grammer* inasmuch as its reasoning is inconsistent with yet another Supreme Court's decision, "which indicated that there is no presumption of enforceability simply because a statute speaks in terms of rights."  *Id*. (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 18-20 (1981)).  *Duncan*'s cardinal conclusion, relying upon *Gonzaga*, is that courts should be reluctant to find implied causes of action in Spending Clause legislation[19] but, moreover, FNHRA did

---

[18]  The Supreme Court in *Alexander v. Sandoval* discussed at considerable length that the directive to federal agencies in distributing public funds and empowering the agencies to enforce their regulations either by terminating funding or otherwise does not create a private remedy and "tend[s] to contradict a congressional intent to create privately enforceable rights."  *Alexander v. Sandoval*, 532 U.S. 275, 289-93 (2001).

[19]  On this note, recognized constitutional scholar and Circuit Court Judge of many years Richard Allen Posner wrote that "Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals."  *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 910 (7th Cir. 2003).  "[G]iven the Supreme Court's hostility . . . to implying such rights in spending statutes," Judge Posner noted that 42 U.S.C. § 1396(a)(19) did not create a private right of action.  *Id*. at 911 (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002)).

not articulate a clear and unambiguous intent to confer individual federal rights on nursing home residents, particularly against a private nursing home. *Id.* at *10; *accord Brown v. Sun Healthcare Group, Inc.*, 476 F. Supp. 2d 848, 851 (E.D. Tenn. 2007) (finding that Congress did not intend to create a cause of action against nursing homes when it passed the Medicaid Act); *M.A.C. v. Betit*, 284 F. Supp. 2d 1298 (D. Utah 2003).

This Court shares and adopts the same views found in *Brogdon*, *Duncan,* and other concurring decisions that FNHRA does not clearly and unambiguously authorize a private federal cause of action for nursing home residents against private nursing homes. FNHRA lacks the rights-creating language critical to reflecting Congress's intent to create a new federal right or individual entitlement that would be enforceable under § 1983. Just because a party may enjoy certain federal rights does not necessarily mean that they have a private cause of action. Any mention of a resident's rights is viewed as a component of the aggregate focus of FNHRA, and the Court concurs with its sister courts that the unmistakable focus and purpose of FNHRA's statutory funding scheme is to improve the quality of care in nursing homes so that they can be certified to receive federal funds for providing services, and if they fail, sanctions may be imposed, including withholding or withdrawing those federal dollars. In essence, FNHRA establishes "yardsticks" to measure aggregate

performances of the programs and services, and not the particular needs of any particular person.  *See Gonzaga*, 536 U.S. at 282.   These are the chief components of a typical funding statute.  *Pennhurst*, 451 U.S. at 22.   The overall text and structure of FNHRA provides no indication that Congress intended to create new individual rights.  To the contrary, rather than establishing a new federally enforceable right, the statute explicitly announces that a resident may pursue any other federal and common law right.  42 U.S.C. § 1396r(h)(8); *see supra* note 17.   Nursing home residents are not foreclosed nor without a remedy should a nursing home fail to provide the standard of care directed by FNHRA.   Here, Baum has several causes of action sounding in both negligence and gross negligence and has remedies to redress her grievances.

As a further indication that Congress did not intend a federally enforceable right for nursing home residents, we look no further than to the statutory scheme found in New York's Public Health Law, which is a corollary to the Medicare and Medicaid Acts.   As mentioned above, N.Y. PUB. HEALTH LAW § 2803-c proclaims similar, maybe even more, rights of patients in certain medical facilities, including nursing homes.[20]   The ostensible distinction between the federal and state statutes is that New

---

[20]   The New York State Supreme Court, Appellate Division also noted the similarities between New York's Public Health Law § 2803-c and 42 U.S.C. § 1396r(c).   *Doe v. Westfall Health Care Ctr., Inc*., 303 A.D.2d 102, 106 (N.Y. App. Div. 4th Dep't 2002).

York co-joined another provision to § 2803-c in order to create a statutory private cause of action, in addition to any other common law cause of action. Public Health Law § 2801-d, states, in part that, "[a]ny residential health care facility that deprives any patient of said facility of any right or benefit, as hereinafter defined, shall be liable to said patient for injuries suffered as a result of said deprivation[.]" Read together, sections 2801-d and 2803-c create a private action against residential health care facilities. *Doe v. Westfall Health Care Ctr., Inc*., 303 A.D.2d 102, 106-07 (N.Y. App. Div. 4th Dep't 2002); *Randone v. State of New York*, 910 N.Y.S.2d 355, 358 (N.Y. Ct. Cl. 2010) (noting that these statutes create an additional remedy "separate and distinct from other available traditional tort remedies"). Even though § 2803-c, via § 2801-d, creates a Patient's Bill of Rights, a violation of the state law "would not implicate a federal right supporting a claim under Section 1983." *Gillespie v. New York Dep't of Corr. Servs.*, 2010 WL 1006634, at *6 (N.D.N.Y. Feb. 22, 2010).

Speaking of Patient's Bill of Rights, which is exactly what 42 U.S.C. § 1396r(a)-(c) constitutes, the Supreme Court has made clear that they do not confer enforceable rights. *Gonzaga* reminds us that the Supreme Court had previously rejected the claim that the Developmentally Disabled Assistance and Bill of Rights Act of 1975 conferred enforceable rights. *Gonzaga*, 536 U.S. at 279-80 (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. at 28). Other Patient's Bill

of Rights have met similar fates in that they did not create enforceable federal rights. *Monahan v. Dorchester Counseling Ctr., Inc*., 961 F.2d 987, 994 (1ˢᵗ Cir. 1992). *Monahan* addressed the Restatement of Bill of Rights for Mental Health Patients, 42 U.S.C. § 10841, which is similar, in many material respects, with those rights enumerated in 42 U.S.C. § 1396r(b)-(d). *See Mele v. Hill Health Ctr*., 609 F. Supp. 2d 248, 255 (D. Conn. 2009) (citing *Monahan*, 961 F.2d at 994). Without more, a Patient's Bill of Rights does not give rise to a private cause of action. *Walter v. New York City Health Hosp. Corp.*, 2005 WL 324242, at *3 (S.D.N.Y. Feb. 9, 2005).

But, the Court would be remiss if we did not discuss a case that generated some reflection and pause as to our ruling, *Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004), which we find distinguishable from the matter before us. The Medicaid Act, Title 42, Chapter T, Subchapter XIX, is a very comprehensive statute addressing a myriad of policy issues related to grants provided to states for medical assistance programs. There are very few federal legislative initiatives that are as broad and sweeping as the Medicare and Medicaid Acts. The particular provision discussed in *Rabin* is 42 U.S.C § 1396r-6 (not to be confused with § 1396r(a)-(c), our statute), which is an exceptionally comprehensive and complex law pertaining mostly to Aid to Families With Dependent Children (AFDC). For those families who were eligible for AFDC, Congress provided a temporary grace period before their benefits would

be terminated due to the family's increased level of earned income.  An AFDC family that was eligible in at least three of the six months immediately preceding the month in which such family becomes ineligible for such aid remains eligible for Medicaid for a period up to a year.  362 F.3d at 191.  This extended eligibility is also referred to as transitional medical assistance (TMA).  The State of Connecticut abolished the program and established a new cash assistance program, which effectively terminated the plaintiffs' eligibility for the previously granted, remaining benefits, without the benefit of a fair hearing and despite Congress continuing to define eligibility by reference to the former AFDC program.  The Second Circuit found that § 1396r-6 gave the plaintiffs legal entitlement to an additional six-month extension as long as they complied with reporting requirements.  *Rabin* therefore found that a specific right to these AFDC benefits was conferred upon persons who met the various requirements and deprivation of such right could support a § 1983 action.  The Second Circuit ordered an "entry of summary judgment in favor of **[only]** plaintiffs establishing that Section 1396r-6 requires the provision of TMA to those persons in receipt of earned income who are discontinued because - under new eligibility provisions enacted by state - their earned income causes them to become ineligible for AFDC," and no one else.  *Id*. at 202 (emphasis added).  The Second Circuit found a right for only a narrow set of beneficiaries under this particular statute, where the intent to bestow an

enforceable right was manifestly clear.  Such specificity and clarity are not present in our case.  Noteworthy, the Second Circuit in *Rabin* did not take the opportunity to declare that the entire cast of intended beneficiaries found within the broad and sweeping Medicaid Act were given private federal causes of action.  Therefore, *Rabin* should be narrowly construed only as to an AFDC's family who may have found themselves within the same circumstances as those plaintiffs.  Further, *Rabin* does not stand for and should not serve as a precedent with regard to the recovery of compensatory damages for the failure to meet a standard of medical care.  *Compare Joseph S. v. Hogan*, 561 F. Supp. 2d 280 (E.D.N.Y. 2008).[21]

This Court declines to adopt the holding of *Grammer*, 570 F.3d 520.  Rather, the Court is obliged to following the persuasive instruction of *Prince v. Booker*, 29 Fed. Appx. 52 (2d Cir. 2002), and *Gonzaga*, 536 U.S. 273.  This Court embraces the notion that "[i]t is implausible to presume that . . . Congress . . . intended private suits[,] [pursuant to 42 U.S.C. § 1396r(a)-(c),] to be brought before thousands of

---

[21] The *Joseph S. v. Hogan* court found that certain provisions of the FNHRA conferred enforceable rights for the very reasons this Court rejects. 561 F. Supp. 2d 280 (citing, *inter alia*, to *Rabin v. Wilson-Coker*, 362 F.3d 190 (2d Cir. 2004)).  *Joseph S. v. Hogan* provides a thorough discussion of the *Rabin* decision but, it also candidly highlights other recent Second Circuit decisions where those laws did not create individual rights that were enforceable.  *Id.* at 296-97 (citing *NextG Networks of New York, Inc. v. City of New York*, 513 F.3d 49, 52-53 (2d Cir. 2008) and *Loyal Tire & Auto Ctr. v. Town of Woodbury*, 445 F.3d 136, 150 (2d Cir. 2006)).  This very discussion supports this Court's view that *Rabin* should be narrowly construed and its rationale and finding were not rendered to recognize a panoptic swath of intended beneficiaries, especially those intended beneficiaries under 42 U.S.C. § 1396r.  Therefore, in this respect, the only Second Circuit precedent on point is *Prince v. Booker*, 29 Fed. Appx. 52 (2d Cir. 2002).

*-33-*

federal - and state - court judges[.]" *Gonzaga*, 536 U.S. at 290.  This Court holds that Baum has failed to state a cause of action under § 1983.

## E.  State Actors

Assuming, *arguendo*, that the Court found otherwise that Baum suffered a deprivation of an enforcement federal right, the Court must then discuss whether Wingate, a private nursing home, can be deemed a state actor or acting under the color of state law.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citing *Monroe v. Pape*, 365 U.S. 167, 171 (1961), for the proposition that a complaint must allege "that the person who has deprived him of [a federal] right acted under color of state or territorial law"); *Sclafani v. Spitzer*, _ F. Supp. 2d _, 2010 WL 3386022, at *7 (E.D.N.Y. Aug. 27, 2010) (citing *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004) for the succinct pronouncement that a § 1983 claim can only be brought against a state actor or private party acting under the color of state law).  Private conduct alone, no matter how wrong or heinous, is not within the purview of § 1983.  *United States v. Morrison*, 529 U.S. 598, 621 (2000) (quoting the pronouncement in *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948), "[t]hat [the Fourteenth] Amendment erects no shield against merely private conduct, however discriminatory or wrongful").  To establish a state action, the deprivation of rights must be caused by the exercise of action by the State "or by a person for whom the State is responsible and the party charged with the

deprivation must be a person who may fairly be said to be a state actor." *West v. Atkins*, 487 U.S. 42, 49-50 (1988) (citations and quotation marks omitted). Obviously, state officials and state employees are considered state actors. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 935 n.18 & 937 (1982); *see also West v. Atkins*, 487 U.S. at 54 (finding that a physician employed by North Carolina to provide medical services to state prison inmates acted under the color of state law); *cf. Polk County v. Dodson*, 454 U.S. 312 (1981) (finding that even though a public defender may be a state employee, his role is outside the kin of a traditional governmental function).

There is no single test that is determinative of whether a private person or entity may be a state actor, but rather a host of factors. Over the years, the Supreme Court has fashioned several tests to assist a court in that determination. A state actor may be found when: (1) "[the challenged activity] results from the State's exercise of coercive powers;" (2) "the State provides significant encouragement, either overt or convert . . . or when a private actor operates as a willful participant in joint activity with the State or its agents;" (3) "it is controlled by an agency of the State;" (4) "it has been delegated a public function by the State [known as the public function test];" or (5) it is entwined with governmental policies or when government is entwined in its management or control[.]" *Brentwood Acad. v. Tennessee Secondary Sch. Athletic*

*Ass'n*, 531 U.S. 288, 296 (2001) (citations, quotation marks, and alterations omitted).[22]

In essence, in order to deem a private person or entity a state actor, the action and decision must be "fairly attributable to the State." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. at 937.   What actions are fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity[,]" which necessarily makes it a "fact-bound inquiry[.]" *Brentwood Acad.*, 531 U.S. at 296 & 298.   Notably, "Supreme Court cases on [the issue of state actor and state action] have not been a model of consistency." *Cooper v. United States Postal Serv.*, 577 F.3d 479, 491 (2d Cir. 2009) (quoting Justice O'Connor's dissent in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 632 (1991)).

*Blum v. Yaretsky* is a critical precedent for our discussion herein and provides decisive, if not dispositive, instruction as to whether a private nursing home that receives federal funds and is heavily regulated under the Medicaid Act, 42 U.S.C. § 1396 *et seq.*, is a state actor.  457 U.S 991 (1982).   Under these federal regulations,

---

[22] On occasion, these criteria have been stated differently but the impact remains the same:

The conduct of private actors can be attributed to the State for [§ 1983] purposes if (1) the State compelled the conduct, (2) there is a sufficiently close nexus between the State and the private conduct, or (3) the private conduct consisted of activity that has traditionally been the exclusive prerogative of the State. *See Sybalski v. Indep. Group Home Living Program, Inc.,* 546 F.3d 255, 257 (2d Cir. 2008).

*Hogan v. A.O. Fox Mem'l Hosp.*, 346 Fed.Appx. 627, 629 (2d Cir. 2009).

*-36-*

nursing homes were required to establish utilization review committees (URC) of physicians whose primary function would include periodical assessment of patients' level of care and whether that level of care would justify their stay at the health care facilities or if they should be downgraded to another type of facility. The plaintiffs therein sued the State because of the nursing home's decision to reduce their level of care which relegated them to a lower level care facility. Basically, the plaintiffs' complaint was about the nursing home's decision to discharge or transfer Medicaid patients. *Id*. at 1007. The question presented was whether the State could be held liable for the action of a private party, rather than the converse where a private party's conduct is fairly attributable to the State. But that distinction is of no great consequence because *Blum*'s analysis is applicable to both considerations, and the factors to be considered are identical no matter the status.

The crux of *Blum* in relieving the State defendant of any liablilty ultimately turned on medical judgments made by the private doctors "according to professional standards that [were] not established by the State." *Id*. at 1008. But *Blum* did not rest there; it continued to explore all of the issues attending to the discussion of state action and state actors. *Blum* tells us that just because a nursing home is extensively regulated, "the mere fact that a business is subject to the state regulation does not by itself convert its action into that of the State for purposes of the Fourteenth

Amendment." *Id*. at 1004 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).  Moreover, it is critical for a plaintiff to show a "sufficiently close nexus between the State and the challenged action of the regulated entity so that the action . . . may be fairly treated as that of the State itself. . . . [and] that the State is *responsible* for th[is] specific conduct." *Id*. (emphasis therein, citations and quotation marks omitted).  A showing that the State has coercive powers over the private actor may constitute state action, but we must be mindful that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to hold the State responsible." *Id*. at 1004-05.  Lastly, a close nexus between the private actor and the State may be shown when "the private entity has exercised powers that are traditionally the exclusive prerogative of the State." *Id*. at 1005 (citations and quotation marks omitted).

In addressing each of the above tests, *Blum* clearly demonstrates that the state and federal regulation did not command the decision to discharge the Medicaid patient, and even the State's ability to impose sanctions upon health care providers adds "nothing to [a] claim of state action." *Id*. at 1010.  The Supreme Court emphatically stated that it is "unable to conclude that nursing homes perform a function that has been traditionally the executive prerogative of the State." *Id.* at 1011 (internal quotation marks and citation omitted).  And, the Supreme Court summarily

dismissed the proposition that either the state regulations or even the relationship between the State and nursing homes made them "joint participants" in the decision to discharge these Medicaid patients.  In summary, the *Blum* Court provides this vital observation that is a talisman for this Court to consider regarding state action and whether a nursing home is a state actor:

> [P]rivately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall within the ambit of *Burton [v. Wilmington Parking Auth.,* 365 U.S. (1961)]. *Jackson v. Metropolitan Edison Co.*, 419 U.S. at 357-358.  That programs undertaken by the State result in substantial funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business.

*Id*. at 1011.

Just because the Medicaid Act and state law require the government to provide funding, the State is not required to provide the services itself and the "the day-to-day administration of a nursing home are [not] the kind[s] of decisions [and acts] traditionally and exclusively made by the sovereign for and on behalf of the public." *Id*. at 1111-12.

Our Circuit has responded accordingly that "private actors and institutions, such as the hospitals, nursing home[s], and cemeter[ies] . . . are generally not proper § 1983 defendants because they do not act under color of state law," and the power of the State to license such institution "does not transform a private party's actions into state

action." *White v. St. Joseph's Hosp.*, 369 Fed. Appx. 225, 226 (2d Cir. 2010) (citing, *inter alia*, *Blum*, 457 U.S. at 1004-05). As another example, the Circuit concluded that even where a privately owned hospital - not a state or municipal owned facility - provides medical care, no matter the misdeed the hospital may have committed in providing treatment and care, the hospital is not a state actor. *Kia P. v. McIntryre*, 235 F.3d 749, 756 (2d Cir. 2000) (citing *Blum*, 457 U.S. at 1011, for the holding that "decisions made in the day-to-day administration of a nursing home" do not constitute state action). And as a relevant corollary, as well as a general proposition, the Second Circuit noted that the term "medical assistance" within a State's Medicaid plan does not necessarily mean that the State is obligated to provide medical services. Indeed, the State's obligation is not to actually provide the care but to pay for the cost of care. *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 230 (2d Cir. 1996) (citing *Blum*, 457 U.S. at 1011, for the proposition that "the Medicaid statute requires that the States provide funding for skilled nursing services as a condition to the receipt of federal monies.  .  .  .  [but,] [i]t does not require that the States provide the services themselves.").[23]

---

[23]   *Catanzano by Catanzano v. Wing* ultimately found, for other reasons, that State-created certified home health agencies were state actors for purpose of requiring their compliance with due process hearings, also known as fair hearings. 103 F.3d 223 (2d Cir. 1996). In a preceding case, the Second Circuit grappled with whether certified home health care agencies (CHHAs) created by the State for the sole purpose of providing home health care services were state actors especially

(continued...)

In another recent Second Circuit case, the jurisprudential solidification of the proposition that nursing homes and hospitals when exercising their traditional role of treating patients does not translate into state action was affirmatively confirmed. *See Sybalski v. Indep. Group Home Living Program, Inc*., 546 F.3d 255 (2d Cir. 2008). In *Sybalski*, the parents of a private group home resident sued under § 1983 based upon the facility's failure to provide the appropriate care and the denial of the patient's visiting rights that were required by New York's Mental Hygiene Law. The New York Mental Hygiene Law establishes patient rights similar to 42 U.S.C. § 1396r(b)-(c).   In reviewing the facts in *Sybalski,* the Second Circuit carefully

_____

[23](...continued)

when they determined whether certain medical treatment was necessary and accordingly changed the benefits without notice to the Medicaid patient. *Catanzano by Catanzano v. Dowling*, 60 F.3d 113 (2d Cir. 1995).  The right to a fair hearing was mandated by federal regulations when a state agency responsible for the administration of Medicaid decides to reduce, deny, or suspend benefits. The Second Circuit found that (1) the State had delegated it powers to CHHAs, (2) CHHAs were deeply integrated into the State's regulatory scheme, (3) CHHAs do not make purely medical judgments, and (4) the State has exercised coercive powers and provided significant encouragement to CHHAs' determinations.  And, for all of these reasons, the denial of a fair hearing when the benefits were changed resulted in state action.

Both *Dowling* and *Wing* are distinguishable from our facts because, in essence, they found CHHAs, creatures of a state statute for a particular purpose, were basically state agencies in and of themselves, whereas Wingate, a private nursing home, was not created by the State for the particular purpose of providing health care services; it already existed on its own providing medical care independent of any state mandate and accepting Medicaid patients did not alter that dynamics. Another point should be made here.  *See supra* Part III.C. at p. 16 (citing *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 153 (2d Cir. 2004)).  The *Grammer* case was not against any private concern but rather a government owned and operated nursing home.  570 F.3d at 522 (noting that the defendant was owned an operated by Allegheny County).  When government assumes the traditional duties of a private company and provides those services, those actions are indeed under the color of state law.

employed the tests promulgated by the Supreme Court. *Id*. at 257 (citing *Brentwood Acad. v. Tennesee Secondary Sch. Athletic Ass'n*., 531 U.S. at 296).  First, the Second Circuit noted that "[w]hile the state has established substantive rights for patients in mental health facilities and procedures for protecting these rights, those actions without more, do not amount to significant encouragement, willful participation, or state entwine[ment][.]" *Id*. at 258 (citations, quotations marks and alterations omitted). Next, the Circuit found that the care of mentally disabled patients was "neither traditionally nor exclusively reserved to the state." *Id*. at 259.  Upon rendering a historical perspective as to when the State may have ventured into the care of mentally disabled persons, and finding that private institutional care predated any public institutional care,  the Circuit concluded that the "care of the mentally ill, much less the mentally disabled, was [not] a function traditionally and exclusively reserved by the state[,]" and accordingly found the group home was not a state actor and not liable under § 1983. *Id*. at 259-60 (citations and quotation marks omitted).  And, this Court finds *Sybalski* highly persuasive in terms of our issues, and particularly as to the historical perspective of medical treatment and care rendered by nursing homes. *See Kia P. v. McIntrye*, 235 F.3d at 756 (finding that a hospital acting in its capacity as a private provider of medical care was not a state actor); *Hogan v. A.O. Fox Mem'l Hosp*., 346 Fed. Appx. 627, 629 (2d Cir. 2009) (after *Syblaski*, the Court determined

that the conduct of the defendants, a private hospital and physician, could not be fairly attributable to the State); *cf. Perez v. Sugarman*, 499 F.2d 761, 765 (2d Cir. 1974) (noting that the government, under New York Social Services Law § 395,[24] is responsible for the welfare of children, and thus any delegation to a private actor regarding the custody of children was found to be a public function).

Yet, Baum discounts the importance of *Blum*, *Sybalski*, and its progeny to this case, primarily because *Blum* was issued five years prior to the enactment of FNHRA, which statute, Baum contends, gave the State the responsibility for operating and maintaining a system of nursing home services, and Baum asks this Court to mistrust the precedential value of this Supreme Court decision.  Dkt. No. 20-1 at p. 14. Although this Court respectfully, yet wholeheartedly, disagrees with Baum's contentions, the Court will nevertheless subject our facts to the scrutiny required by *Brentwood* and undertaken by *Sybalski*.  546 F.3d at 257.

To reiterate, private nursing homes have always provided day-to-day medical care and treatment that was never a traditional public function.  The treatment of bed sores, notwithstanding a federal regulation discussing such treatment,[25] was never an exclusive and traditional government function, and simply because there is legislation

---

[24] The common law underpinning for this statute can be found in the long standing doctrine of *parens patriae*.

[25] *See* 44 C.F.R 483.25.

that provides (1) governmental funding, (2) governmental oversight over private concerns in order to improve the quality of care, (3) the ability to impose sanctions, such as withdrawing funds, and (4) an overall regulatory scheme, such treatment and care will not convert into a state action. The receipt of public funds does not make a nursing home's course of treatment of bed sores an act of the State. *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-41 (1982). Extensive and detailed regulations are insufficient to make a private act of treatment state action. *Id*. at 842. And, a private entity, like a nursing home, that performs functions that benefit the public does not make that performance state action nor the performer a state actor. *Id*. Lastly, even if there is a fiscal relationship between the State of New York and Wingate, this does not constitute a "symbiotic relationship," that would transform this private entity's omission and commission into state action. *Id*. at 842-43.

Government does not treat bed sores, doctors employing medical judgment do, and no law or regulation will transmute a traditionally private act by a private actor into a traditional public function, unless government itself gets directly involved in the business of rendering such services as found in *Grammer*. *See supra* note 23; *see also West v. Atkins*, 487 U.S. 42 (finding a part-time doctor working for a prison's medical service was acting under the color of state law).

This Court also finds that Wingate, in treating or failing to treat the decedent

for her bedsores, did not "make extensive use of state procedures with the overt, significant assistance of state officials," nor did it invoke the formal authority of government when acting or not acting as the case may be. *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 622-23 (1991) (citations and quotation marks omitted). Government did not dominate the activity or lack thereof to the extent such conduct would be considered its own. *Id.* at 620. Never was Wingate "endowed by [New York] with powers or functions governmental in nature" nor do we find that New York and Wingate are so entwined because of federal and state funding policies. *Evans v. Newton*, 382 U.S. 296, 299 (1966) (finding that in order to be subject to constitutional limitation, private conduct must become "so entwined with government policies or so impregnated with a governmental character"). Furthermore, it is safe to conclude that New York does not manage nor control Wingate, other than possessing the ability to decertify it from Medicaid reimbursement or withhold funds if standards are not met. *Id.* Moreover, there is no indication that governmental officials exercise "coercive" powers, either overtly or covertly, that would render the treatment or lack thereof, "for all intents and purposes, state action." *City of Cuyahoga Falls, Ohio v. Buckeye Cmty.*, 538 U.S. 188, 197 (2003).

Our findings substantiate that Wingate is not a state actor, at least not in the context of providing or denying treatment to the Deceased. The Court is compelled

by both the law and the facts to find that Baum has not stated a cause of action.  And for all of these reasons, the Court **grants** Wingate's Motion to Dismiss/Summary Judgment the Fifth Cause of Action, Dkt. No. 14.  Having dismissed Baum's only federal law claim, leaving only state common law claims to survive, the Court's jurisdiction has thus been extinguished.  Other than the Motion to Dismiss, there has been no other proceeding and discovery has not commenced.  Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over this case and remands it back to New York State Supreme Court for further proceedings.

       **IT IS SO ORDERED**.

January 24, 2011
Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge